At bottom, this is a dispute between California public entities that generate sewage sludge in a county that wants to protect its residents against the flies, odors, and potential health hazards that that sludge creates. From the characterization of this as an intrastate dispute, two conclusions follow. First, the state law issues this case presents, which turn on the construction and interpretation of an important state statute and the resolution of allegedly conflicting state policies, should be addressed at state courts. And that is why we have filed a motion for certification. Second, because the only entities that wish to land apply biosolids in Kern County are in-state entities, plaintiffs cannot show a case of discrimination under the Commerce Clause. What I'd like to do is talk about certification first and talk about the merits briefly of the state law claim and then talk about the Commerce Clause. The certification is discretionary on our part, is it not? Yes. We could reach the issue if we chose. Yes, you could. One of the question that I would have on that is that preemption rules are fairly well settled in California. I mean, you read whatever it is, Big Creek or whatever. I've forgotten what the creek is. It pretty well sets out what the rules are. I know we have certified some preemption issues, and the Court has accepted them. But why should we do that here just because it's an important issue? I would say three things, Your Honor. The first is that state law preemption is not that settled. Big Creek, Lumber stands in some tension with Action Department. In fact, the Senate in Action Department accused the majority of not following the rules in Big Creek Lumber. Sure. But that was a field preemption case, which this is not. I don't think it was, Your Honor, with all respect. I would characterize Action Department as a case where the local law impaired a state right or privilege, the litigation privilege. I don't think it was a field preemption case. And there's also tension, may I say, in the issue of whether the blue circle cement test is or is not a part of California law. Our view is that it is not. The plaintiffs take the other view, and that issue has never been squarely resolved by the California courts. So there is a live dispute about preemption and the standards that state courts use in determining whether local law is preempted by state law. But even if that weren't true, there's still a novel dispute about the interpretation of the Integrated Waste Management Act. To be sure, there are a fair number of cases that construe the act. But there's not one, and I don't understand plaintiffs to argue to the contrary, that looks at the Integrated Management Act in a context that is even remotely similar to this case. So there are really two novel issues here. One is what is the standard for state law preemption, you know, in the abstract. And the second state law issue that needs to be resolved is what is the preemptive force of the Integrated Waste Management Act. Do you agree that the Action Department Association standard is the standard that would apply here, the inimicable? The ultimate standard, yes, is whether local law is inimical to state law. That standard is set forth in Creek Lumber, in Action Apartments, in Sherwin-Williams. But once you drill down, there's a lot of uncertainty, I think, about what exactly that means and how it's applied in particular cases. Well, can the county of Kern here comply with both Section 451 of, we're calling it CEWA, or whatever that is, the Act. Integrated Waste Management Act. Okay. What were you referring to? The Act. The Act, okay. Can it both comply with the requirement that it maximize the use of all feasible source production and recycling, that requirement that applies statewide, and simultaneously impose a ban on, within its own county, on the land application of biosolids? I think there's no conflict. And the reason is that the mandate in 40051 applies only when a public entity is implementing the Act. Plaintiffs would have it otherwise. I mean, they quote the statute, that statute, 13 times in their briefs. Aren't all public entities in the State of California now required to comply with that Act? Yes, they are. But they're only required to comply with the Act when they implement it. Isn't that a narrow interpretation of implement? No. With all respect, Your Honor, the Act focuses on public entities in their capacity as waste generators. Every entity has to work out a plan to tell the State how it's going to dispose of its waste and submit that plan to the State Integrated Waste Management Board. The Act focuses on public entities as waste generators, not as waste regulators. I mean, after all, it's called the Integrated Waste Management Act, not the Integrated Waste Regulatory Act. And the one thing we know about Measure E is that when the county passed it, its voters were not implementing the Integrated Waste Management Act. Instead, the ---- No, they were contravening it. No. With all respect, they were implementing their home rule power under Article 11, Section 7 of the California Constitution. Well, let me ask you this, hypothetically. Could every county in California ban the land application of biowaste because, you know, the flies and the smell and still have any life or viability? I mean, are you ---- Because if Kern County can do this and every county can do this, isn't that inimitable to the Act? I have two responses to that. The first is we hear a lot from the plaintiffs about how the Act is intended to promote and maximize recycling. But you have to drill down a little further into the Act to determine what is the precise policy at issue here. Because while there's a ---- The Act says you have to promote and maximize recycling. What it says about land application is quite a bit different. What it says about land application, and, indeed, it's the only form of recycling to which these restrictions apply. Land application, if you look at Sections 41, 781.1 and 5002 per NB, land agency makes a determination that land application won't harm public health or the environment. So what the legislature did, it distinguished between recycling as a whole and land application in particular and imposed significant burdens on land application that don't apply to recycling in general. And it's obvious why they did that. I mean, when you put your bottles out on a curb every week or in your cans in your newspapers, that doesn't create a lot of public health hazards. But, obviously, land application does pose potential risks. So the legislature had every reason to distinguish between recycling in general, which the Act unquestionably promotes, and land application in particular, whose endorsement by the Act is, at best, lukewarm and certainly not uncritical. So I don't think it's correct to say that there's a broad policy favoring recycling that applies in toto, in hot verba, as it were, to land application in particular. Is there any doubt that land application is within the term recycling? There is not. And, indeed, that is why, even if the Act otherwise applied, the measure is protected by the Savings Clause in Section 40059, which specifically refers to the nature and extent of solid waste handling services. And recycling is unquestionably a solid waste handling service if you look at 40057. Let me just go back to Judge Warlow's question for one more minute, though. And that's the question, what if everybody did it? The one thing we know about that is that we don't know, that the legislature did not consider the question of what would happen if every jurisdiction applied or adopted a measure like Kern County. You could search the legislative history of the Integrated Waste Management Act from top to bottom and find no discussion of that issue. And the issue would have to be and should be resolved by the political branches. After all, we live in a society where these decisions are made by the political branches and not by bureaucrats or technocrats. And we don't know how the legislature would decide that issue if it were confronted with it. But we do know that they've never made that decision. They did not make that decision when they adopted the Integrated Management Act and they haven't made it since. And we also know that the city of Los Angeles and the county of Los Angeles and Orange County are not without representation in the California legislature. And if they believe that the measure reposes the problem, they can go to the legislature and work out a legislative solution. These are hard questions. I mean, you can look at the efforts that the federal government has made to find a place to store radioactive waste. They're difficult issues, but they have to be resolved by the political branches, and that has not been done yet. We don't know how it would be done, but this Court shouldn't short-circuit that process by holding that there's a conflict between the Act and Measure E when, in fact, there is no conflict for the reasons I've mentioned. Let me say a few words, then, about the Commerce Clause, because this really is a pretty easy Commerce Clause case. The courts define the discrimination prohibited by the Commerce Clause as, quote, differential treatment of in-state and out-of-state economic interests that benefit the former and burdens the latter. Where is the interstate commerce in this case? I don't know either, Your Honor. There isn't any, because it's undisputed that the only people who want to land-apply biosolids in the county are in-state entities. Well, they do say that if they're prohibited from going to Kern County, they have to go to Arizona. That's correct. Is that enough to implicate the Dormant Commerce Clause? Well, it may be enough to implicate it, but it's not enough to show discrimination. Well, that just is – that just – that's a boon, not a burden. That's what I would think. And, in fact, Measure E, the actual effect of Measure E is exactly like the amended ordinance in Ben Orleans and the two Eighth Circuit cases that follow Ben Orleans, UNI Sanitation and IESI-AR Corp. All three of those cases are cases that involve flow restrictions that applied only to the in-state disposal of waste. You had the choice. If you wanted to dispose of your waste in-state, you had to use the designated transfer facility. But if you wanted to go out-of-state, there was no problem. And in all three cases, the Court held that there was no discrimination under the Commerce Clause under those facts in our cases, similar. Finally, of course, you don't have to even get to the issue of whether you interstate commerce here because under the Department of Revenue v. Davis, this case, there's no Commerce Clause discrimination because this is discrimination between governments. All the entities that generate biosolids are all public entities. And Department of Revenue v. Davis teaches that public preference between government entities is different than private preference between private entities. I'm referring specifically to footnote 9 in that decision. So for those reasons, there is no Commerce Clause case here at all. Let me just get back to, in my one minute that I have, let me just get back to 40059 because even if the Court found that Measure E were otherwise within the Act, 40059 is a savings clause that prevails over every other provision of that statute and, indeed, any other provision of law. And it provides that local governments can determine the nature, extent, and location of solid waste handling services. We know, as the Court indicated, that recycling is a solid waste handling service. Why do you think the California Supreme Court would be likely to interpret that as broader than garbage collection? Because its plain language leads inescapably to the conclusion that it is not limited to garbage collection because it covers the nature. Solid waste handling service is the operative term in 40059A. And to determine what a solid waste handling service is, you can look no further than 40057, two statutes away, which explicitly defines solid waste handling service as including recycling. Everyone agrees that land application is a form, and a typical form perhaps, but a form of recycling. So the question is, does Measure E... And use of recycling. The way I read section 40059 is that it's talking about services, frequency of collection. It's not talking about land application or the end use of once all this stuff is picked up and taken somewhere and it has to be disposed of. This is talking about the frequency of collection, transportation, charges and fees, the city of L.A. garbage collection. But the statute goes on. That laundry list is prefaced by the words including but not limited to. And the statute ends with the words nature, extent, and location of providing solid waste handling service. And current Measure E does regulate the nature, extent, and location of one form of solid waste handling service, i.e. land application. So let me focus on that for a second. Is the land application by private farms in the unincorporated areas of Kern County a service provided by Kern County? No, it is not. It's not. So how does it fall within the statute? Because there's nothing in the statute that requires that the service be provided by a county. And, in fact, even under plaintiff's interpretation of the statute, it applies to private garbage collection. So there's nothing in the statute that requires the service be provided by a county. No, no. But you're arguing the application of 459, and it applies to each county, city, district, or other local government agency. It does not apply to a private farm. But the cases have held that it applies to local governments in their capacity as a regulator because the cases have held, for example, the prototypical example is a city or a county can determine how often garbage can be collected by a private entity, by a franchisee, for example. And in that case, the franchisee is a private entity by definition. So it's not the case to suggest that the service providers covered by 40059A have to be public. They don't. And in most cases, they are not. Counsel, you're down to about two and a half minutes. Yeah, yeah. I'll reserve it for rebuttal. Thank you. All right. You may do so. We'll hear from the city. Good morning, Your Honors. Tom Hickson for appellees. I'd like to begin by addressing the two questions that the court framed in its order of last Friday in the whether appellees have prudential standing to sue under the Dormant Commerce Clause and whether Kern has waived that issue by not raising it in front of the district court. Turning to the first question, we have different categories of appellees, so I'm going to address each one in turn, refer to the evidence in the record that supports prudential standing, and then refer to the case law for that type of appellee. First, there are the municipal waste generators here, the City of Los Angeles, the Orange County Sanitation District, and County Sanitation District No. 2. As to the Orange County Sanitation District, the evidence in the record shows that it currently exports biosolids to Arizona as well as to Kern, and that if Measure E were to go to Kern. I don't understand what difference that makes in terms of implicating the Dormant Commerce Clause, because that's adding, that's putting something into the stream of interstate commerce, not taking it away. It's a forced relocation, meaning they would like to send it to Kern. So what? I mean, that's a, that is a, it's not a burden on interstate commerce. It's all intrastate, and it's so if Orange County goes to Arizona, Los Angeles is likely to, whatever that means. I still don't understand how that affects interstate commerce. Sure. There are, I would direct the Court to the Supreme Court's decision in the Fort Gradio case that dealt with a similar instance where individual counties and cities within Michigan would say that out-of-county waste could not be brought into their county. So they treated out-of-county and out-of-state the same and had the county isolated by itself, and the Supreme Court was called upon to decide, well, is that interstate commerce, if it's just all within the same state? Okay. But who can assert that interest here? I mean, Los Angeles surely cannot. It can't stand in the shoes of somebody from Arizona who might want to do land application here. I mean, its injury is precisely the same. The asserted injury of L.A. is precisely the same whether there are or not interstate dump ores. Well, that's not true. Okay. Why not? We've shown evidence that the City of Los Angeles's cost per ton of land application of biosolids would be doubled if it can do it in Arizona. I didn't say that. Okay. I said the injury is precisely the same regardless of whether there are interstate dump ores who would like to use current unincorporated areas also. That is an interstate commerce burden. The injury to L.A. is the same whether or not there are or wouldn't be. Correct. So under green apartments, under Washoe, why doesn't that just eliminate standing to pursue the – to assert the Commerce Clause challenge? Okay. Well, on the green, there was a local building owner that was challenging the requirement that cell callers have to bring all of their waste to the city dump rather than a different dump. And the court there held that the plaintiff did have standing under the Dormant Commerce Clause, even though both sites were within the same State. The city dump and the alternate dump were both within the same State, but because of the change in geographic location, that imposed a cost on the plaintiff for transporting it to a different location. And I would also point to the other categories of plaintiffs that we have here, the shippers and land suppliers. We have Sierra Transport. We have Western Express. We have RBM. Again, best I can tell, all they'd end up doing is making more money because it's a longer haul to go to Arizona. And that would be in the stream of interstate commerce. Well, what the evidence in the record shows is that they would incur additional costs by having to relocate their business operations in Arizona and to purchase more products. But why is that a burden on interstate commerce? That would help Arizona. It's in interstate commerce. It's not prohibiting it. It's causing or squeezing somebody to go into interstate commerce instead of putting a cap on it. Every local ban on importation does that. It says you can't bring it here. You have to send it somewhere else. Yes. And so this Court in BFI Medical and the Supreme Court in Fort Grady have said that that kind of local bans on importation qualifies interstate commerce violations. Getting more to the merits of your dormant commerce clause claim, but traditionally that theory arises from some kind of protectionist activity by the entity that's imposing the regulation. And I don't see what economic benefit there is to Kern County at all by banning the disposal of the solid waste here. In fact, to me it appears that it's going to be economically disadvantaging some of the businesses in the unincorporated regions of Kern County. The local economic benefit that Measure E is designed to protect is local agribusiness that doesn't use these biosolids. And Measure E recites that in the preamble as one of the reasons why Kern is trying to How does it economically benefit the local agribusiness that doesn't use them? Well, one of the stated purposes was to restore confidence in other farms and products grown in the unincorporated area so they aren't associated with biosolids. But how does that, how can that be when, in fact, the incorporated cities within Kern County, Bakersfield being the largest, allows the land application of biowaste? And so to the typical consumer, it's still from Kern County. How do you know whether or not it's been grown on, with land with biosolids or land without biosolids from Kern County? This was the determination that Kern made in enacting Measure E. The measure reflects their decision that within the unincorporated area, local agribusiness would be benefited by not having an association with biosolids. And if that's the determination that they're going to make in adopting the initiative, I think we can use that against them in saying, well, you're trying to favor local agribusiness as opposed to us. All right. Maybe they thought they were favoring local agribusiness. Well, it is, it's an initiative process. So we have the campaign that clearly targeted Los Angeles. There aren't scientific studies that went into Measure E. Are we able, are we allowed to consider the legislative history in a commerce clause challenge? I know there's some dispute as to that and other types of challenges. Right. Yeah, when the plaintiff is challenging an initiative and arguing that there's an improper purpose behind it, whether or not stated on the face, the court can look behind to rhetoric aimed at the voters, because that's what there is in place of a legislative history. I would direct the court to the Washington v. Seattle School District case, where that type of evidence, there was a ban on school busing. And on its face, it was written mutually, and the Supreme Court said, well, we can look behind that, and we can see that there was a racial animus there. And here, what we have in terms of history are newspaper articles and editorial pieces, and we've shown some of the vivid imagery that current has had associated with the initiative. And that's not in dispute. There's no one out there saying, well, that really wasn't the intent, or people weren't urged to vote for the initiative for that reason. But the court, the answer is yes, the court can look behind that, because with an initiative, that's what there is by way of legislative history. I would like to turn to certification and the standards there. It is discretionary. Once the threshold requirement has been met for certifying a case to the California Supreme Court, the court then has to decide whether or not to do that. So we would offer prudential reasons why we think certification is not appropriate here. In looking at the typical case where this court certifies to a state supreme court, they generally fall into two buckets. The first is where there are conflicting lower court decisions within a state. So you're trying to find out what state law is, but it points in different directions, and you would ask the state supreme court to clarify. The other bucket is when there's a sweeping rule of law or a clear pronouncement of a rule of law that you can see was going to have large applications in other cases, and so it's appropriate to defer those to the state supreme court. I would submit we're not in either of those situations here. We don't have conflicting state court decisions that the court has to deal with. Well, what about Mr. Mayer's comment that Big Creek is in tension with action apartments? Those cases were decided by the same justices within two years of each other in the supreme court, and it's difficult to believe that they thought that they were acting in tension with themselves. Action apartments speaks directly to the issue before us, whether obstacle preemption is sufficient. Does state law have to command something that local law affirmatively forbids or vice versa? And it said no, and the court specifically trained in on the dissenting argument to the contrary and said that's wrong. Obstacle preemption is the standard under state law. And in Big Creek, the court was dealing with the field preemption argument, and what it said was that there isn't a ban, a municipal ban of the type of measure used here, so there isn't that kind of tension with the state law in question. But the action apartment standard has been adhered to by the supreme court in other cases. We've cited a number of them in our brief, including People v. City of Seal Beach, International Brotherhood, and then Fiscal v. San Francisco by the First District Court of Appeal. But there's no case law that says you can have a municipal ordinance that undermines the purpose of state law, and I think we all agree that the test is whether it's inimical to the purposes of state law. So that broad question of preemption is not unsettled under California law. Ginsburg. Well, the standard's not unsettled. So what's your best argument that the Measure E is preempted? Under the plain language of Sections 40,051 and 40,052 of the CIWMA, each local agency, including Kern, is required to promote and maximize all feasible methods of recycling. The undisputed evidence shows that land application of biosolids is a method of recycling. On summary judgment, Kern stipulated to that in our undisputed facts. The evidence shows that it's feasible. Los Angeles and the other plaintiffs have been doing it in Kern County since 1994, and Kern's Measure E undermines that feasible method of recycling by flat-out banning it. Now, you're not arguing field preemption, are you? No, I'm not. I'm arguing only conflict preemption. Well, it seems to me that the measure only bans one method of recycling. What's your take on that? If it were a total ban on all recycling within Kern County, then you might have an argument. But since it's tailored and very narrowly described, where's the conflict? It bans all methods of recycling this form of solid waste. Your Honor is correct. It doesn't ban methods of recycling other forms of solid waste. And so then we would turn to Sections 40,051 and 40,052 that mandate that Kern promote and maximize all feasible methods of recycling, that it can't carve out this major exception and completely prohibit it. It's not just land application. It's composting. It's using any pellets or really any form of beneficial reuse of land application is what Measure E prohibits. But doesn't the statute, the Act, give discretion to the local agency as to which methods it will use to promote recycling? It doesn't. And that's actually an interesting part about Section 40,051 is there are three priorities. Priority number one is source reduction. Priority number two is recycling. Priority number three is discretionary. It's transformation and incineration or some non-beneficial reuse. So the legislature drew a line. It said one and two are not discretionary, and number three is discretionary. And there's a California case law interpreting what that language means. It's the city of Dublin case that we referred to on our briefs, where the city of Berkeley adopted a Measure D that flat out prohibited incineration. And the plaintiffs challenged that, saying, well, that's preempted by the IWMA. And the Court of Appeals said no, because incineration is a method of transformation. And it focused on that language in Subsection 3 of Section 40,051 that calls out transformation and makes it discretionary in the local agency. And that's a clear distinction between non-beneficial reuse and what we're doing here, which is recycling. And that brings me to a larger point, which is that Curran has argued that the legislature didn't really speak to the issue of preemption, and so that's a policy concern that they should be left to resolve. But that's not quite accurate, because Section 40,051 does speak to which methods of reuse are discretionary and which are not. And it calls that transformation as a non-discretionary one, leaving recycling as one that's mandated. Let me ask you about Curran's argument that this is the measure is simply a regulation of, you know, left to the local entities, local cities, counties, to determine how the services will be handled when we're recycling or dealing with these kinds of applications. They rely very heavily on 459. They do. And I don't think that reliance is well placed. The statute speaks in terms of franchising and collection fees. And it's interesting that Subsection B of that statute refers specifically to the garbage collection and storage. And that overall, I mean, Measure E has nothing to do with franchising or contracting or exclusive licenses, which is what the language of Section 40,059 is about. Curran's argument that 40,059 lets them flat-out prohibit a major method of recycling would wipe out the mandate in 40,051 that it promote recycling. It can't be that 40,059 is that broad or would wipe out these recycling mandates in Part 1 that are broader in the statute as a whole. Counsel, going back to 40,051A3, you spoke to transformation, incineration being an example. That section or subsection also refers to environmentally safe land disposal. What's the significance of that reference? Land disposal is a non-beneficial disposal of solid waste. And so one of the issues that we briefed and put evidence on before the district court is why land application is recycling. And we submitted evidence and put in our proposed statement of facts that, you know, the collection, the sorting, the treatment, and the economical reuse of biosolids is what land application is, and that that tracks the language of the statute. And Curran agreed with that. They said those facts were all undisputed. I'm a little confused. Does land disposal connect? Can land disposal be part of recycling? Was it within the definition? No. Land disposal is a different thing. It's not beneficial. It's just dumping on the land. In other words, no treatment or anything like that. Right. It would be a method of disposal, like incineration, where you're not reusing that for anything. Well, isn't that the landfill issue? I mean, the whole reason they wanted to go into this recycling and transformation of the waste is to avoid the landfill problem. It is. Land disposal is somewhat broader than just landfilling, because you could put it on the land rather than in the land. But it's the nonbeneficial reuse. That's what priority three is. And that's why it's discretionary, because that's not what the statute is intended to encourage. Right. So where do you get your take that the county has to – that the county conflicts with 51 when it lessens support for a certain kind of recycling in certain areas by contrast with going full bore on recycling throughout the county? Well, yeah. I would say that under the fiscal v. San Francisco case, it's established that a county can't use its local police powers to undermine the purposes and policies of state law. Well, no. But where do you get on the plain reading of the statute? Where do you get the notion that you can't pull back from any form of recycling anywhere in the county without bumping into the statute? Well, I'm not sure we're saying that that's that broad. The recycling has to be feasible. The statute requires that it be a feasible method of recycling. Yes, but that – yes. And who's going to decide that? Well, that would either be an agency interpreting the statute or this Court, if there is one. I just thought I missed – I thought I heard you say that – that there's a collision whenever there is a de-emphasis of any kind of recycling anywhere in the county. The statute does speak that broadly, because Section 40,052 mandates that CIRM promote all feasible methods of recycling. In this case, we're presented with a major method of recycling rather than an incremental case where there might be a slight de-emphasis on a particular method. And the record shows that the emphasis toward land application in California was very much caused by this statute. It's not, you know, an artifact or an incident. This was this statute, the IWMA, is what caused land application to become the major method of recycling throughout California. So we don't have the extreme case where there might be one minor method. But what we do have here is evidence that this is a major method of recycling and that it would be completely banned under Measure E. And if it could be banned here, it could be banned elsewhere. And we would be left with a constant non-discretionary government function that every municipal agency has to perform, but there's no way that it can be recycled. The purpose of the IWMA would be thwarted by measures such as this. Now, so one more question on 40,051. The introductory phrase uses the words in implementing this statute. Right. What that means in implementing this division, the board and local agencies shall do the following. Well, stop there. Okay. You heard Mr. Mayer's argument that this is not implementation. This is an option. It is not pursuing the structure of the overall state program. I think he's misreading what the word shall modifies. The board and local agencies don't have the option about whether or not they wish to implement it. The IWMA is a mandatory statute. They must implement it. So the preceding clause in implementing this division, the board and local agencies shall, does mean that they shall implement it. Otherwise, the whole statute would be optional. There would be no binding requirement on anyone to comply with it. But they're saying we're not implementing the statute. We're banning the solid land application. This is preemption. We don't want to do what state law says we have to do. They say we have to implement this division. Instead, we're going to prohibit it. And that's just the essence of conflict preemption, that the statute mandates certain policies and priorities that current has to follow. And instead, they've adopted a measure that impedes those and that prevents the implementation of those. And, again, on the idea of whether the legislature has spoken to the question of preemption, I would also direct the court to Section 40,053, which saves reasonable land use regulations not in conflict with the Act. And what that does is it recognizes municipal authority over reasonable land use restrictions, and we're not challenging that here. But it also recognizes that they may conflict with the Act. And this comes right after Sections 40,051 and 52, and all it's saving is ones that aren't in tension. So this idea that there's no sort of binding requirement in Part I of the IWCA isn't correct. The legislature has spoken to that and said you have to do these things, and you can do other things as long as they don't conflict with the priorities  And I also want to address the other question.  I should be summing up. You only have three seconds left. Okay. Well, then, I would reiterate for the Court on the Commerce Clause argument that there is precedent both from this Court and the Supreme Court about out-of-county bans being bans on importation. And I would ask the Court to look at the emphasis of the evidence in the record concerning how the IWCA has played such an important role in promoting land application in California and the consequences that could happen if Measure E were allowed to go into effect and pave the way for other cities to do the same thing. Thank you, counsel. Mr. Mayer, you have some reserve time. Thank you. I want to start, I want to focus on the state law preemption issue. There are four situations where state law has been held that preempt local law. Where local law commands what state law prohibits, where it prohibits what state law commands, where compliance with both is an impossibility, and where state law impairs, where local law impairs a state-created right or privilege. None, this case does not fit any of those criteria. There is no claim, for example, for all of plaintiffs' talk of conflict, there is no claim whatever that Measure E makes it impossible for them to comply with the Act. In fact, the land application that this case concerns is not even meant, they don't even claim diversion credit for it in the plans that they've submitted to the state. So there's no claim of impossibility, no claim of impairment of a state-created right, because even plaintiffs contend that the Act doesn't give them the right to come into the county to land apply biosolids, and no prohibition of what state law commands. So there is no, this case does not fit any of the criteria that the California Supreme Court, that the California courts have used to determine when state law preempts local law. Now, there are cases that they cite, California cases such as Fiscal and Seal Beach, where the courts have talked about conflicting with state policies. But in each and every one of those cases, there was a state-created right or privilege that the local law impaired. And under California law, in cases like Brown v. Kelly Broadcasting and Harris v. Capital Management cited in the plaintiff's brief, you have to look at language in a case to determine what it means. And again, there is no claim of impossibility here, and no claim of impairment of a state-created right. So what you're left... Am I not correct in understanding that what L.A.'s arguing is that this falls under the prohibits with state law commands because Section 40,051 is mandatory that the board and local agencies shall engage in recycling and composting, and that that falls within that section? Isn't that their argument? It may be their argument, but the problem with that argument, Your Honor, is that state law says that they have to generate a plan and submit it to the state board for diversion credit. They have to... What the act intends to do... L.A. has to. L.A. has to do that. Okay. And they've done it. So there's no... And they didn't even claim diversion credit for their land application in Kern County. I don't see how that relates. I thought you were hanging your hat on the 40,051 argument on the language in the statute that says in implementing this division. Yes. And yes, I am. And I hang my hat on that language because when it passed Measure E, the county's voters were not implementing the division. 40,051E only applies to a public agency when it has its hat on as a waste generator. After what the statute does, it says you public agency, you generate waste, you have to devise a plan to show how that waste is going to be recycled and submit it to a state body, and the state body will approve it. And all of those activities, the creation of a plan, a submission to a state agency, that's all implementing the division, and that's all covered by 40051A. But when the county says we're not going to let you land apply biosolids in our county, it's not acting in any capacity that's subject to the act. Thank you, Counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision, and we will hear argument next in United States v. Berry.
judges: O'scannlain, Rymer, Wardlaw